UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re EROS INTERNATIONAL SECURITIES LITIGATION | ) ) ) | Master File No. 15 Civ. 8956 (AJN) |
| _____ | ) | |
| | ) | |
| This Document Relates To:  ALL ACTIONS | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
<u>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

Michael W. Stocker
David J. Goldsmith
Barry Michael Okun
Alfred L. Fatale III
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Tel.: (212) 907-0700
Fax: (212) 818-0477

*Attorneys for Lead Plaintiffs
Fred Eisner and Strahinja Ivoševič
and Lead Counsel for the Class*

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................. 1

Summary of Allegations .......................................................................................... 3

ARGUMENT ........................................................................................................... 7

I.     PLAINTIFFS SUFFICIENTLY
PLEAD MATERIAL MISSTATEMENTS ................................................... 7

     A.     Defendants Misrepresented Eros Now Usage ....................................... 7

         1.     Defendants Effectively Concede
That Most "Registered Users"
Could Not or Did Not Use Eros Now ........................................ 7

         2.     Defendants Misled Investors By Referring
to Individuals Who Could Not and Did
Not Use Eros Now as "Registered Users" ................................ 9

         3.     Defendants' Risk Disclosures
Failed to Warn That "Registered
Users" Could Not Use Eros Now ............................................. 10

         4.     Defendants' "Implausibility"
Argument Fails ........................................................................ 11

     B.     Defendants Misrepresented Eros's Film Library ............................... 12

     C.     Defendants' Misrepresentations
Were Not Mere "Puffery" ................................................................. 13

     D.     Defendants' Misrepresentations Are Not Protected
By the Safe Harbor for Forward Looking Statements ........................ 13

II.     PLAINTIFFS SUFFICIENTLY
PLEAD DEFENDANTS' SCIENTER ........................................................ 13

     A.     Defendants Regularly Received Reports
Contradicting Their Public Statements ............................................. 14

     B.     The Lulla Family's Depletion of Eros's Capital
Motivated Defendants to Defraud the Market .................................... 20

III.   PLAINTIFFS SUFFICIENTLY
       PLEAD LOSS CAUSATION ........................................................................................ 21

IV.    PLAINTIFFS STATE CLAIMS FOR
       CONTROL PERSON LIABILITY .............................................................................. 24

Conclusion ........................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*BG Litigation Recovery I, LLC*
   *v. Barrick Gold Corp.*,
   180 F. Supp. 3d 316 (S.D.N.Y. 2016)..................................................................12

*In re BioScrip, Inc. Securities Litigation*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015).....................................................17, 18, 19

*Carpenters Pension Trust Fund of St. Louis*
   *v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)...............................................................................5, 8

*Cotter v. Gwyn*,
   Civ. No. 15-4823, 2016 WL 4479510
   (E.D. La. Aug. 25, 2016) ....................................................................................20

*Cross Atlantic Capital Partners, Inc.*
   *v. Facebook, Inc.*,
   No. 07-2768, 2011 WL 925440
   (E.D. Pa. Mar. 17, 2011) .................................................................................9-10

*In re Delcath Systems, Inc. Securities Litigation*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)...................................................................21

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................24

*In re EVCI Colleges Holding Corp.*
   *Securities Litigation*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006)...................................................................17

*In re Fannie Mae 2008 Securities Litigation*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012).................................................................11

*Fila v. Pingtan Marine Enterprise Ltd.*,
   No. 15-CV-267 (AJN), 2016 WL 3962015
   (S.D.N.Y. July 19, 2016) ....................................................................................23

*GAMCO Investors, Inc. v. Vivendi, S.A.*,
   917 F. Supp. 2d 246 (S.D.N.Y. 2013).................................................................11

*Harris v. AmTrust Financial Services, Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015).................................................................24

*In re Independent Energy Holdings PLC*
   *Securities Litigation,*
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)..................................................................13

*In re Initial Public Offering Securities Litigation,*
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)..................................................................21

*Itoba Ltd. v. LEP Group PLC,*
   930 F. Supp. 36 (D. Conn. 1996).......................................................................25

*Katyle v. Penn Nationl Gaming, Inc.,*
   637 F.3d 462 (4th Cir. 2011) .......................................................................22, 24

*In re Merrill Lynch Auction Rate*
   *Securities Litigation,*
   No. 09 MD 2030, 2011 WL 536437
   (S.D.N.Y. Feb. 9, 2011),
   *aff'd*, 690 F.3d 98 (2d Cir. 2012) ....................................................................21

*In re MF Global Holdings Ltd.*
   *Securities Litigation,*
   982 F. Supp. 2d 277 (S.D.N.Y. 2013).............................................................11, 13

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)..............................................................................13

*In re OSG Securities Litigation,*
   12 F. Supp. 3d 622 (S.D.N.Y. 2014)...................................................................25

*Pennsylvania Public School Employees'*
   *Retirement System v. Bank of America Corp.,*
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)................................................................19

*In re Petrobras Securities Litigation,*
   150 F. Supp. 3d 337 (S.D.N.Y. 2015).................................................................21

*Plumbers & Pipefitters Nattional Pension Fund*
   *v. Orthofix International N.V.,*
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)...................................................................18

*In re Proquest Securities Litigation,*
   527 F. Supp. 2d 728 (E.D. Mich. 2007)..............................................................20

*In re Regeneron Pharmaceuticals, Inc.*
   *Securities Litigation,*
   No. 03 Civ. 3111 (RWS), 2005 WL 225288
   (S.D.N.Y. Feb. 1, 2015)....................................................................................11

*In re Reserve Fund Securities*
    *& Derivative Litigation*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010)........................................................................19

*Robb v. Fitbit Inc.*,
    No. 16-cv-00151, 2016 WL 6248896
    (N.D. Cal. Oct. 26, 2016)........................................................................................18

*In re Royal Ahold N.V. Securities*
    *& ERISA Litigation*,
    351 F. Supp. 2d 334 (D. Md. 2004)..........................................................................25

*In re Satyam Computer Services Ltd.*
    *Securities Litigation*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)......................................................................25

*Sawabeh Information Services Co. v. Brody*,
    832 F. Supp. 2d 280 (S.D.N.Y. 2011).......................................................................14

*SEC v. Alliance Leasing Corp.*,
    No. 98-CV-1810-J, 2000 WL 35612001
    (S.D. Cal. Mar. 20, 2000)........................................................................................12

*Sharette v. Credit Suisse International*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)........................................................................21

*Snellink v. Gulf Resources, Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) .....................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................13, 14

*United States v. Keplinger*,
    776 F.2d 678 (7th Cir. 1985) ............................................................................ 17-18

*VTech Holdings, Ltd. v. Pricewaterhouse*
    *Coopers, LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004).......................................................................21

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011).......................................................................21

*In re Xethanol Corp. Securities Litigation*,
    No. 06 Civ. 10234 (HB), 2007 WL 2572088
    (S.D.N.Y. Sept. 7, 2007).........................................................................................24

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) .....................................................................19

*In re Zynga Inc. Securities Litigation*,
 No. C 12-04007, 2015 WL 1382217
 (N.D. Cal. Mar. 25, 2015) ................................................................................................18

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants'

motion to dismiss the Amended Consolidated Class Action Complaint for Violations of the

Federal Securities Laws (the "Complaint").[1]

## **Preliminary Statement**

Defendants touted Eros Now as "the Netflix meets Hulu meets Spotify meets iTunes of

Indian content," a streaming media service that would lure millions of customers in India and

around the world.  Defendants sent Eros stock soaring as they publicly claimed skyrocketing

numbers of "registered users" of Eros Now, climbing from 2.3 million to 30 million between late

2014 and October 2015.

Plaintiffs' initial consolidated complaint alleged that third-party data tracking downloads

of the Eros Now mobile application, or "app," showed that Defendants' representations of tens of

millions of "registered users" of Eros Now were false and misleading.  In moving to dismiss,

Defendants argued that such data was immaterial because most of Eros Now's "registered users"

did not access the service through the app, but rather through mobile telephone browsers that

connected to the internet by a means of data transfer called Wireless Access Protocol ("WAP").

Defendants thus effectively conceded that the mobile app data did not support Eros's

representations of rapid growth in the number of "registered users."

Plaintiffs amended, and allege in the Complaint before the Court that Defendants'

representations of millions of "registered users" were false and misleading because browsers

using WAP, an outmoded technology that nonetheless was predominant in India during the Class

Period, did not support any meaningful use of the Eros Now service.  In their present motion to

dismiss, Defendants now argue that although market participants understood the term "registered

---

[1] Capitalized terms used herein are as defined in the Complaint unless otherwise stated.  Citations to "¶ __" herein refer to paragraphs of the Complaint.  Emphases in quotations are added unless otherwise noted.

users" to mean people who could *use* Eros Now, the term in fact described people who merely *registered* with Eros Now by providing their e-mail address or telephone number, regardless of whether they could use Eros Now at all.  According to Defendants, it does not matter whether users utilizing WAP were able to actually *use* the service and thus be a potential source of future revenue for the Company.

Defendants knew that the "registered users" were not actually using the Eros Now service.  Detailed allegations from the former consultant who set up the Eros Now platform establish, among other things, that the Individual Defendants were aware that Eros Now's actual usage was far lower than what would be generated by the number of "registered users" they proffered to the market.  Defendants received weekly reports showing actual Eros Now usage. One weekly report, for example, indicated usage levels entirely inconsistent with the number of "registered users" announced the very next day.

The Complaint also alleges that Defendants' claims of the numbers of films that Eros released annually were false, showing, on a film-by-film basis, that large percentages of the films Defendants claimed Eros released in 2014 and 2015 were released in previous years.  Defendants respond by arguing that "release" doesn't mean release, pointing to language in Eros's financial statements that says that a certain category of films might be assigned a release date other than the actual date of release, but not showing any disclosure suggesting that any particular film identified by Plaintiffs falls into that category.

Eros stock fell 17% after Wells Fargo – following a conference call management had held with a limited group of analysts – lost confidence in the reliability of the Eros Now user count and, critically, in the Company's ability to "monetize" the service.  A series of detailed articles posted on the investor website *Seeking Alpha* cast further doubt on Eros's growth story,

as well as the accuracy of Eros's representations concerning its film library, resulting in further and larger stock declines.  The Wells Fargo analyst report and *Seeking Alpha* articles disclosed new and market-moving information that corrected prior falsehoods – so much so that Eros felt compelled to respond in kind to two of the articles.

Defendants' motion to dismiss should be denied in its entirety.

## Summary of Allegations

Eros is an Indian film entertainment, or "Bollywood," company that produces, acquires, and distributes Indian-language films in theatrical, television, and digital formats worldwide. ¶¶ 2, 48.  Since its inception, Eros has been run by and for the benefit of the Lulla family as a vehicle for the transfer of money to relatives and associates through extensive and systematic related-party transactions that generated personal wealth for them, but limited corporate profits. ¶¶ 3, 49-55.

By the early 2000s, the members of the Lulla family were looking for an opportunity to increase the economic benefits they derived from their relationships with the Company without having to create organic growth.  They could do this by accessing the public capital markets, but only if they could convince investors that Eros had genuine opportunities to expand its business in the highly competitive and rapidly developing media market.  ¶¶ 4, 56-59.

In August 2012, Eros launched Eros Now, a streaming media service whereby users and subscribers access films and other content on demand through mobile phones and other internet-enabled devices.  Company executives saw Eros Now as crucial to the success of Eros's U.S. initial public offering, commenced in November 2013.  ¶¶ 5, 60-61.  Analysts considered Eros Now to be the Company's "most enticing growth opportunity" and a "compelling opportunit[y] for the stock" that had "the potential to be a real needle mover down the road."  ¶¶ 6, 67-69.

On February 17, 2015, Eros announced that Eros Now's "registered users" had jumped from 2.3 million to more than 14 million, mostly as a result of new "registered users" obtained from Techzone, a low-tech company Eros had acquired.  ¶¶ 13, 77, 243, 245-247.  For this acquisition to be accretive to Eros Now, however, the Company would have had to convert Techzone's low-tech ringtone customers into users of Eros Now's service, and ultimately to become "monetized" paying subscribers.  This was a pipe dream, as Techzone's customers – like most of the market in India – did not possess equipment technologically capable of accessing Eros Now.  ¶¶ 9-12, 84-93, 117-121.

On June 10, 2015, Eros announced a further significant increase in Eros Now "registered users" to 19 million.  ¶¶ 13, 80, 256-260.  On August 18, 2015, Eros announced a further increase in "registered users" to 26.5 million.  ¶¶ 82, 265-269.  On October 13, 2015, Eros Now reported an astonishing 30 million "registered users" as of September 30, 2015.  ¶¶ 13, 275, 278.

The vast majority of these "registered users" were in fact unable to use Eros Now owing to the limits of broadband internet penetration in India and the technological limitations of the browsers then (and now) in general use in India, Eros Now's primary market.  ¶¶ 18-19, 84-93.  At that time, there were few avenues for users in India to stream content on Eros Now.  Access to the internet via desktop and laptop computers ("PCs") in India was then, and still is, relatively uncommon.  Accordingly, would-be users of Eros Now content would have to access its film library on mobile devices.  This could be done either using a downloadable mobile app developed by the Company, or via wireless access to the internet.  ¶¶ 10, 63-66, 85-87.  Most mobile phones in common use in India during the Class Period were unable to download apps or access full-data (HTML) internet websites, as are accessed on PCs.  Rather, they could only access stripped-down websites via WAP, a technology (now largely abandoned in Europe and

North America, where advanced smartphones have HTML-enable browsers) developed to permit early mobile phones to have limited access to a low-data version of the internet.[2]  ¶¶ 11, 86-90. Indeed, Defendants premised their initial motion to dismiss, and base the present motion as well, on the fact that the "overwhelming majority" of Eros Now's registered users would have to utilize WAP to access the service through a mobile browser.

Because of its technical limitations, however, WAP could not support a streaming movies-on-demand service like Eros Now.  On WAP, streamed movies would be subject to poor resolution, small images, and frequent, lengthy interruptions for buffering, and downloading a feature-length film would take days.  Accordingly, the WAP users that Defendants acknowledge constituted the great majority of the "registered users" they touted could not actually use Eros Now's service.  ¶¶ 12, 93.

As for the few "registered users" who accessed Eros Now via either mobile apps or HTML-enabled browsers on PCs or later-generation smartphones, third-party industry data showed that they were not using Eros Now in any great number, either.  Data from App Annie, which tracks app downloads, disclosed only a minimal number of downloads of the Eros Now app during the Class Period.  ¶¶ 96-105.  Data from SimilarWeb, which tracks visits to websites via HTML browsers on PCs and mobile phones, disclosed that visits to the Eros Now website averaged only two or three minutes, with the majority of visitors "bouncing" away from the first page they accessed rather than exploring other pages on the site.  ¶¶ 19, 106-114.  Thus, the few users who actually had the technological capability to make use of Eros Now, were not doing so.

---

[2] Defendants appear to view "WAP" as synonymous with "mobile phone browser," such that all mobile and smartphones use WAP browsers.  Defs. Mem. at 5.  WAP is only one outdated protocol used for mobile phone browsers, however.  Although WAP remains predominant in India, WAP has largely been abandoned in North America and Europe in favor of mobile phone browser protocols that are compatible with data-rich and far more user-friendly HTML.  ¶¶ 11, 63, 65.  Plaintiffs' allegations defining and describing WAP control on this motion to dismiss.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

Defendants were aware that the usage level of Eros Now, as reported to the Individual Defendants in weekly reports containing such data as the number of movies viewed each day, was much lower than it should have been were the Company's tens of millions of "registered users" actually taking advantage of the services Eros Now provided.  ¶¶ 177-181.

Defendants also mispresented Eros Now's film portfolio, important to investors both as a source of revenue for the Company and as a source of content for Eros Now.  For example, research regarding movie release dates disclosed that, of the 69 films Eros claimed in its annual report for fiscal year 2014 to have released that year (later reduced to a claimed 68 films when the *Seeking Alpha* writer pressed Eros to identify each film specifically), 17 were in fact released in prior years.  ¶ 139.  Similarly, of the 65 films Eros claimed in its annual report for fiscal year 2015 to have released that year (later reduced to a claimed 64 films when the *Seeking Alpha* writer pressed Eros to identify each film specifically), 20 were in fact released in prior years. ¶¶ 138-139.

After Eros management failed to provide any "granular data" about the number and location of Eros Now users at Eros's first-ever "Investor Day" program on October 13, 2015, analysts began to question the claims Defendants had been making over the course of the previous year and more about Eros Now's user base and Eros's film portfolio.  ¶¶ 21-23, 144-151.  Based on a nonpublic conference call with Eros management and independent research including purchase of data from App Annie and other sources, Wells Fargo issued an analyst report on October 23, 2015, stating that the analyst was unable to verify Eros's claimed numbers of registered users – a "red flag for investors."  Eros stock dropped 17%.  ¶¶ 24, 152-155.

A series of detailed articles posted on *Seeking Alpha* on October 30, November 10, and November 13, 2015, reported that the author's research also contradicted Eros's claims regarding

Eros Now usage and Eros's film portfolio.  ¶¶ 25-28, 156-157, 160-161, 164.  Eros stock fell

materially in response to each of these reports.  ¶¶ 25, 27, 29, 155, 158, 162, 165.

## ARGUMENT

## I.   PLAINTIFFS SUFFICIENTLY PLEAD MATERIAL MISSTATEMENTS

### A.   Defendants Misrepresented Eros Now Usage

Defendants' serial representations of ever-increasing numbers of Eros Now "registered

users" were false and misleading because nearly all of these "users" were technologically

incapable of making meaningful (and monetizable) use of Eros Now's service, and the few who

were technologically capable of using the service were not actually doing so.  ¶¶ 84-121.

Defendants argue that they never represented that "registered users" could actually *use*

Eros Now.  *See* Defs. Mem. at 2, 4-5, 8-11.  As further discussed below, the term "registered

user" connotes an individual who not only signed up with Eros Now, but also actually could and

did *use* the service and hence potentially could generate revenue for the Company.

### 1.   Defendants Effectively Concede
That Most "Registered Users"
Could Not or Did Not Use Eros Now

The Complaint alleges facts showing that the vast majority of claimed "registered users"

either could not or did not use Eros Now's service.[3]  Eros Now could be accessed by either WAP

browsers on cell phones or early-generation smartphones, mobile apps, or HTML-enabled

browsers on later-generation smartphones and PCs.  ¶¶ 63-66, 85-88.  As for WAP, which

Defendants acknowledge was the means by which the great majority of "registered users"

---

[3] Defendants argue that even if WAP users could not view feature-length movies on Eros Now, Eros Now also offered relatively short-form content like music videos.  Defs. Mem. at 10 n.9.  The Complaint alleges with factual support, however, that WAP could not adequately accommodate even such short-form media given WAP's issues with pixilation and image size.  ¶ 93.  In any event, streamed movies-on-demand and other long-form content was the focus of Eros Now's value proposition, both as Defendants represented it and as the market understood it.  ¶¶ 67-69, 240, 257, 259, 267, 279.

accessed Eros Now, the Complaint alleges that is incapable of supporting practical use of Eros Now's service.  It cannot provide a smooth, full-sized moving image and is subject to frequent pixilation.  ¶ 93.  It would take days to download a feature-length movie through WAP, so a movie could only be viewed in parts.  *Id*.

Other than a fleeting reference to the supposed "ease with which registered users gained access to content" (Defs. Mem. at 5), Defendants do not attempt to challenge the Complaint's factual showing that WAP users could not make meaningful use of Eros Now's service – and these allegations must be taken as true at this stage in any event.  *See*, *e.g.*, *Carpenters,* 750 F.3d at 232.

The other means of connecting to Eros Now – apps and HTML-enabled browsers – *are* capable of supporting meaningful (and monetizable) use of the service.  ¶¶ 64, 66, 87.  The Complaint sets forth third-party data obtained from industry providers (App Annie for apps, and SimilarWeb for HTML-enabled PC and mobile browsers) showing that Eros Now usage via apps and HTML-enabled browsers was minimal during the Class Period.  ¶¶ 94-105, 106-114.

Defendants argue that the low usage rates reported by App Annie and SimilarWeb are immaterial because the great majority of Eros Now's so-called "registered users" instead utilized mobile-phone WAP browsers, which App Annie and SimilarWeb do not track.  Defs. Mem. at 9-10.  But that is the point.  Having demonstrated that the effective means of accessing Eros Now were not being used, the Complaint alleges facts establishing that WAP could not support any meaningful, monetizable usage of Eros Now's service – showing that, no matter how many millions of "registered users" Defendants claimed for Eros Now, only an insignificant number of them were actually *using* it.

## 2. Defendants Misled Investors By Referring to Individuals Who Could Not and Did Not Use Eros Now as "Registered Users"

Defendants' principal argument is that Plaintiffs' allegations concerning the low usage of Eros Now are immaterial because the term "registered users" should have been understood by investors and analysts to connote only individuals who "registered" with Eros Now by giving the Company an identifying e-mail address or telephone number, whether or not they actually could view streamed content on Eros Now.  Essentially, Defendants argue, it did not matter to the markets that the great majority of the claimed "registered users" were unable to *use* Eros Now's services, so long as they *registered* with Eros Now.  Defs. Mem. at 2, 4-5, 8-11.

Defendants are wrong.  Investors and analysts looked to these numbers as a sign that the Company was successfully enlarging its base of streaming content consumers, a key first step to converting those users into paying subscribers.  *See* ¶¶ 70-83.  Analysts understood "registered users" to be actual users of Eros Now's service who could and would be converted into paying customers.  *See, e.g.,* ¶ 76 ("We see this deployment as the key for the stock to work, and are encouraged by sub[scriber] growth to date."); ¶ 83 ("Next Step: Monetization.").

The markets had good reason to believe that a "registered user" is a person who *uses* a service for which he or she has registered.  "Registered user" means "a user of a website, program, or other system who has previously *registered*."[4]  ¶ 62.  The term "user", in turn, means "a person who interacts with a system, typically through an interface, *to extract some functional benefit*."[5]  *Id.*  Indeed, one court has defined "registered user" as "a *user* who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller."  *Cross Atl. Capital Partners, Inc. v. Facebook,*

---

[4] https://en.wikipedia.org/wiki/Registered_user [emphasis in original]

[5] https://en.wikipedia.org/wiki/User_(system)

*Inc.*, No. 07-2768, 2011 WL 925440, at *1 (E.D. Pa. Mar. 17, 2011). Thus, a "registered user" is not just a registrant, but also a user.

Defendants argue that they made no misrepresentations about the quality of the user experience for WAP customers. Defs. Mem. at 8. Similarly, with reference to the HTML users who stayed on the Eros Now site for only two or three minutes and then "bounced" off the home page (¶¶ 106-114), Defendants argue that they made no representations concerning the duration of visits. Defs. Mem. at 10. That is all beside the point. Defendants represented that Eros Now had millions of "users" when in fact most of those individuals were unable to make any meaningful use of Eros Now's streaming service – and the very few who could, did not.[6]

Defendants further argue that the data showing insignificant usage via the app and mobile and PC HTML browsers is immaterial because the extent of usage is somehow irrelevant to their representations regarding the number of "registered users." Defs. Mem. at 9-10. Because "registered user" connotes a *user* of the site, the low usage rates belie Defendants' representations of large numbers of "registered users."

### 3.   Defendants' Risk Disclosures Failed to Warn That "Registered Users" Could Not Use Eros Now

Defendants contend that risk disclosures of the low level of mobile and PC technology and wireless and internet penetration in India rendered the alleged misstatements immaterial as a matter of law. Defs. Mem. at 8-9.

Such unspecific and untethered "warnings" are insufficient to shield Defendants from liability for overstating Eros Now's "registered user" numbers when the "warnings" failed to

---

[6] Defendants assert that "Techzone users were, in fact, converted into Eros Now subscribers." Defs. Mem. at 19 n.25. That is incorrect: Techzone users may have been induced to register with Eros Now, but the Complaint alleges, and Defendants effectively concede, that Eros Now had very few paying subscribers during the Class Period. *E.g.*, ¶ 75. Further, Defendants contend that CW1's averment that Eros used Techzone's customer base to "pad" Eros Now's registered user count is inconsistent with Plaintiffs' theory of liability. Defs. Mem. at 10-11. To the contrary, Eros inflated Eros Now's "registered users" count by inducing Techzone customers to register despite having no basis to believe such customers could *use* Eros Now. ¶¶ 70-93, 115-121.

disclose the key fact that was important to investors, which was not the underlying circumstances of the state of wireless and broadband penetration in India, but that the great majority of the "registered users" claimed for Eros Now were in fact unable to use its service. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012) ("To be meaningful, a cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.").[7]

### 4.    Defendants' "Implausibility" Argument Fails

Finally, Defendants assert that "it is highly implausible that Defendants misled the market about the Eros Now user experience" because "millions of registered users were interacting with the service on a real-time basis and thus had a firsthand account of any deficiencies." Defs. Mem. at 11.

Defendants misled the market not about the "Eros Now user experience," but rather about the number of Eros Now users, by counting as "users" individuals whom Defendants knew were technologically incapable of making meaningful use of, and were not in fact using, Eros Now's streaming service. Moreover, the experience of Eros Now's purported "users" *in India* has no bearing on what investors on a U.S. exchange knew. There is no requirement for purchasers of stock on the New York Stock Exchange to go to India to research consumer experience with an issuer's product in order to test the issuer's representations regarding the usage of that product. *See GAMCO Inv'rs, Inc. v. Vivendi, S.A.,* 917 F. Supp. 2d 246, 256-57 (S.D.N.Y. 2013) (no duty for even sophisticated investor to investigate issuer's representations before purchasing securities). And such a fact-based defense cannot be decided now. The sole case Defendants

---

[7] *See also In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2015) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability."); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315-16, 318 (S.D.N.Y. 2013) ("The Company's public filings and statements were . . . insufficient in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described.") (citation omitted).

cite in support of this contention applies the "truth on the market" defense, which is "intensely

fact specific." *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 325

n.59 (S.D.N.Y. 2016) (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).

###### B.     Defendants Misrepresented Eros's Film Library

Having argued that the Company did not use the term "users" to mean users, Defendants

go on to argue that "release" doesn't mean release.  The Complaint alleges that Defendants

misrepresented, in Eros's annual reports and other public statements, the number of films that

Eros released.  The Complaint alleges, among other things that whereas Eros reported releases of

69 films in fiscal year 2014 and 65 films in fiscal year 2015, 17 of the claimed 2014 releases and

20 of the claimed 2015 releases were actually released in prior years.  The Complaint names the

films involved (from lists taken from Eros's website) and gives the actual release date for each.

¶¶ 129-130, 138-139.

Defendants respond by pointing to language in Eros's annual reports stating that Eros

acquires over 90% of its film from third parties and that, in the case of "low budget films," the

release date given for films that Eros did not itself release theatrically is the date of Eros's initial

non-theatrical exhibition.  Defs. Mem. at 12.  Defendants attempt to bridge these two

unconnected statements by making the unsupported assertion that low budget films "comprise

the bulk of Eros's acquisitions."  *Id.*  Defendants make no attempt, however, to establish that any

particular film alleged in the Complaint to have a misrepresented release date falls into that "low

budget acquisition" exception, nor do Defendants cite anything to show that the specific

allegations of misrepresented release dates are incorrect.  *See SEC v. Alliance Leasing Corp.*, No.

98-CV-1810-J (CGA), 2000 WL 35612001, at *9 (S.D. Cal. Mar. 20, 2000) (general disclaimer

insufficient to counteract specific misrepresentation).

### C.   Defendants' Misrepresentations Were Not Mere "Puffery"

Defendants' argument that their misrepresentations concerning Eros Now's growth prospects are mere "puffery" (Defs. Mem. at 14) fails because Defendants knew their statements were false when made.  *See*, *e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (finding that statements describing retailer's inventory as "in good shape" and "under control" were not puffery when defendants "allegedly knew that the contrary was true"); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317-18 (S.D.N.Y. 2013) (statements about MF Global's "robust," "effective," "adequate," and "comprehensive" internal controls were not puffery because they were "misrepresentations of existing fact").  Defendants had knowledge of the falsity of representations claimed to be "puffery" such as that, for example, Techzone's customer base could contribute to the Eros Now registered user count.

### D.   Defendants' Misrepresentations Are Not Protected
###      By the Safe Harbor for Forward Looking Statements

Similarly, Defendants concede that forward-looking statements are actionable if they were made with knowledge of their falsity.  Defs. Mem. at 14.  Defendants knew of the falsity of any "forward looking statements," such as that "registered users" who could not even use Eros Now's services could be "monetized" into revenue-generating subscribers.  *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 757 (S.D.N.Y. 2001).

## II.   PLAINTIFFS SUFFICIENTLY PLEAD DEFENDANTS' SCIENTER

Scienter may be properly alleged through facts showing either: (1) "motive and opportunity to commit fraud"; or (2) circumstantial evidence of recklessness or conscious misbehavior.  *Novak*, 216 F.3d at 307.  Plaintiffs plead both.

The requisite "strong inference" of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 324 (2007).  Rather, it is sufficient if the inference is one that is "**at least as likely as** any plausible opposing inference." *Id.* at 328 (emphasis in original); *see also Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) (a "tie . . . goes to the plaintiff").  The Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

### A.   Defendants Regularly Received Reports Contradicting Their Public Statements

Plaintiffs' allegations raise a strong inference that Defendants knew, or were reckless in not knowing, the truth about Eros Now usage levels and the number of films Eros released.

CW1 was a paid consultant to Eros's Digital division – which was responsible for Eros Now and, once acquired, Techzone – hired to participate in the development of Eros Now and reporting directly to Eros CEO Lulla.  ¶¶ 57, 116, 191.  As such, CW1 was fully familiar with the internal operations of Eros as related to Eros Now.  CW1 attested to a number of facts that show that Defendants were a tight-knit management group in possession of information showing that Eros Now's service was not being used at levels consistent with their representations of "user" numbers, and that, contrary to Defendants' representations, Techzone customers could not reasonably be expected to turn into monetizable subscribers to Eros Now:

- Eros was highly metric-driven.  Eros Now was the subject of internal "dashboards" that tracked an array of critical metrics, including new user registrations, numbers of subscribers, and their usage of the service.  Eros used off-the-shelf software for this purpose, such as Kissmetrics, Customer.io, Segment.io, and Mix Panel, which produced output analytics.  ¶ 176.

- Dashboard reports were circulated automatically by e-mail at Eros and Eros Digital, the group responsible for Eros Now and Techzone, on a daily and weekly basis.  The e-mail attached two or three pages of automatically generated charts, graphs, and analytics.  There were separate outputs for the Eros Now app and the Eros Now website.  *Id.*

- CW1 and others at Eros Now, including Rishika Lulla Singh, the CEO of Eros Digital (and Kishore Lulla's daughter), received these dashboard reports on a daily basis throughout CW1's tenure at the Company.  ¶ 177.

- Kishore Lulla, Jyoti Deshpande, and Andrew Heffernan received the reports on at least a weekly basis.  *Id.*

- Each "dashboard" listed, among other things, the total number of "plays" of movies on Eros Now on a daily basis.  On February 16, 2015 – the day before the Company announced that Eros Now had 14 million "registered users" – the dashboard indicated that there were approximately only 20,000 plays of movies on Eros Now, far fewer plays than would have been generated by a user base of 14 million people.[8]  Accordingly, Defendants knew from their own internal systems that 14 million "registered users" were not meaningfully using Eros Now's service.  ¶ 179.

---

[8] Even if each play was by a unique registered user, those 20,000 plays are significantly fewer than the average number of plays that would occur in one day if each of 14 million "registered users" were to watch only one movie in a year, *i.e.*, 14,000,000 users/365 days = 38,356 plays.  In comparison, Netflix has stated publicly that its users watched a total of 29.1 billion hours of streamed content in 2014, and 42.5 billion hours of streamed content in 2015.  Analysts at UBS have estimated that these numbers are equivalent to 1.6 hours and 1.8 hours watched per subscriber, per day, in 2014 and 2015.  This means that, whereas the numbers on the Eros Now dashboard would not even support that each "registered user" watched an average of one movie **per year**, Netflix users as a whole watched the equivalent of one movie **per day** in 2014 and 2015.  ¶¶ 179-180.

- Eros Now and Techzone had fundamentally different user bases.  Anyone reading the reports could see how many users Eros Now had as of the date of the report.  Because Techzone, like Eros Now, was an active separate business within Eros Digital, Eros senior management, including Lulla, Deshpande, Heffernan, and Rishika Lulla Singh, received daily or weekly dashboard reports with comparable metrics for Techzone and its user base.  Eros executives knew the actual Eros Now and actual Techzone numbers from internal dashboard reports, and yet reported much higher Eros Now numbers to the financial markets.  ¶ 181.

- CW1 was opposed to the idea of using Techzone customers to inflate the Eros Now "user" count, and told Kishore Lulla so.  CW1 was opposed to this because CW1 viewed Techzone's customer base as unable to become real users of Eros Now's movie-on-demand service.  CW1 also believed that value-added services, such as Techzone's ringtone business, was a dying business that would eventually fade in India, as it did in the United States.  Techzone was acquired at least in part to inflate Eros Now's user numbers.  ¶ 182.

- Defendants Kishore Lulla, Deshpande, and Heffernan were all privy to the inner workings of Eros, including having knowledge about the number of Eros Now's users and the number of movies in Eros's film library.  ¶ 185.

- Defendant Heffernan joined Eros from Grant Thornton UK, a midmarket accounting firm, and was Kishore's man.  *Id*.

- Defendant Deshpande was very close with Defendant Heffernan.  ¶ 185.

Defendants attempt to attack CW1's credibility.  *See* Defs. Mem. at 10.  But "at the pleading stage the issue is not whether these confidential witnesses are telling the truth.  It is

whether there is a probability that they know what they are talking about." *In re EVCI Coll. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96-97 (S.D.N.Y. 2006).

Defendants argue, citing this Court's decision in *In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (Nathan, J.), that when CW1 avers that "the Techzone acquisition did not produce large amounts of Eros Now users" and that "virtually none of the Techzone users became Eros Now users because they were two distinct user bases" (¶¶ 117, 120), the Complaint fails to allege how and when CW1 obtained this information and how Defendants knew it. Defs. Mem. at 19. Plaintiffs allege, however, that CW1 was a consultant to Eros's digital division – which encompassed both Eros Now and, once it was acquired, Techzone – that the witness worked with that division in the development and execution of Eros Now, and that the witness reported directly to Eros's CEO, Defendant Lulla. ¶¶ 57, 116, 191. The most reasonable inference is that CW1 knew of this information in that capacity, and he knew that Defendants knew of that information through working with them or their subordinates. This is far more detail than that provided in *BioScrip*, where confidential witnesses merely described problems at a division of the company and stated that management was "pretty involved" in managing that division, but did not, as here, allege relationships and interactions with management that would permit the witnesses to know what management knew. *See BioScrip*, 95 F. Supp. 3d at 739.

Thus, Plaintiffs allege that, according to CW1, "dashboard" reports were regularly sent to Eros senior management (including, at the time CW1 was at Eros, Defendants Lulla, Deshpande, and Heffernan)[9] on a weekly basis, which showed actual usage of the Eros Now service at a

---

[9] The Court can reasonably infer that the same materials were sent to Defendant Parameswaran, who succeeded Defendant Heffernan as Eros's CFO at about the time CW1 left Eros. ¶ 178. Defendants do not argue that Parameswaran's duties as CEO were different than Heffernan's or offer any reason to infer that Parameswaran would not have received the same internal reports as his predecessor. *See United States v. Keplinger*, 776 F.2d 678,

much lower level than the high "user" numbers Defendants were simultaneously claiming would engender.  ¶¶ 176-190.

Further citing *BioScrip*, Defendants argue that CW1 might know that these "dashboards" were **sent** to Eros management, but he does not know whether they **read** them.  Defs. Mem. at 18, 19-20.  The complaint in *BioScrip*, however, merely referred to unspecified reports "often" received by management, without describing their content or times of transmission.  95 F. Supp. 3d at 739-40.  Here, the Complaint refers to specifically described reports that CW1 knows were provided to Eros management on a certain specified schedule.  Plaintiffs do not, as Defendants would have it, merely allege that Defendants "would have" or "should have" known the information in the reports, but that they **did.**  *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (confidential witness allegation that reports covering the subject of misrepresentations were sent to named management member sufficient to plead scienter, without specifying that the management member read the reports, because the management member "either knew about the information or showed a reckless disregard for it"); *see also Robb v. Fitbit Inc.*, No. 16-cv-00151-SI, 2016 WL 6248896, at *10 (N.D. Cal. Oct. 26, 2016) (scienter adequately pled by allegations that a confidential witness provided monthly reports to a top executive that contradicted the company's public statements – without specifying that the reports were read); *In re Zynga Inc. Sec. Litig.*, No. C 12-04007-JSW, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015) (plaintiffs adequately pled scienter by means of allegations from confidential witnesses about the "accessibility of daily reports" containing information that contradicted defendants' public representations).[10]

---

691 (7th Cir. 1985) (reasonable to infer that a company acts in accord with its own business practices regarding distribution of materials).

[10] Defendants do not seriously dispute that releasing films is a "core operation" about which management can be charged with knowledge.  It would be absurd to suggest that the management of a Bollywood film production and

Defendants argue that Plaintiffs do not allege that the information in the "dashboards" contradicted public statements about Eros Now's usage.  Defs. Mem. at 19-20.  That assertion is premised, however, on Defendants' misuse of the term "registered user" to include people who register with Eros Now but never actually use the service.  As discussed above, Plaintiffs allege that the actual Eros Now usage rates reported on the "dashboards," such as the number of views of movies, were much lower than rates that conceivably could have been generated by the tens of millions of "users" Defendants publicly claimed.  ¶¶ 179-180; *see*, *e.g.*, *Pennsylvania Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) ("[W]hile Plaintiff does not allege that any of the Executive Defendants reviewed an audit report indicating serious errors in amortization schedules, the fact that BoA's senior managers saw these reports is sufficient to impute knowledge of their contents to BoA.").

Defendants assert that scienter is negated by what they have called an "independent internal review" conducted by the Skadden firm.  ¶ 167; Defs. Mem. at 22.  The "investigation," however, was conducted by the Audit Committee of the Board of Directors with the "assistance" of Skadden, and Skadden issued no public opinions or findings.  The Audit Committee similarly has released no report on the investigation, and its self-interested statement that it "remains

---

distribution company would not know how many films the Company released each year.  Defendants assert that the core operations doctrine did not survive the enactment of the PSLRA.  Defs. Mem. at 21.  While this Court has expressed skepticism about the continued validity of the doctrine, *see BioScrip*, 95 F. Supp. 3d at 738, the Second Circuit has not spoken and other courts in this District have adopted the doctrine.  *See*, *e.g.*, *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) (denying motion to dismiss on basis of "core operations" scienter allegations).

CW2's averments bolster the already strong inference of scienter.  An Indian film producer with knowledge of Eros's business practices derived from his direct dealings with Eros, he averred that Eros regularly overstates the number of films in production, lists films in its library that were never made, and that, specifically, as of December 2015, Eros's website listed 24 films as being in production that were not being produced at all.  ¶¶ 55, 141-142.  Defendants observe that CW2's direct dealings with Eros preceded the Class Period (Defs. Mem. at 20), but Defendants' state of mind prior to the Class Period can be indicative of their state of mind during the Class Period.  *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) ("The proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case.").  Defendants' discussion of the unproduced *Sarkar 3* film (Defs. Mem. at 21 n.29) is an improper attempt to argue the facts on a motion to dismiss.

satisfied with the Company's financial reporting and disclosures in its financial statements as filed" has no bearing on the pleading of the Individual Defendants' scienter. *See* ¶¶ 167-173.[11]

### B. The Lulla Family's Depletion of Eros's Capital Motivated Defendants to Defraud the Market

Through an extensive series of self-dealing transactions, Defendants depleted the Company of cash, which they diverted to their own personal purposes. ¶¶ 52-57, 183-184. In order to replenish Eros's coffers – to keep the Company alive for their own continued employment and as a further source of funds – they took Eros public. ¶¶ 56, 187-188. And in order to attract investors, both in the IPO and on a continuing basis, Defendants misrepresented Eros Now and the film library.[12]

Defendants' sole challenge to Plaintiffs' motive allegations is that all of the self-dealing transactions were publicly disclosed. Defs. Mem. at 17. That argument is off-point. Plaintiffs

---

[11] Defendants Deshpande and Parameswaran each certified pursuant to the Sarbanes-Oxley Act that the information in relevant SEC filings was true and complete, and that internal controls and procedures existed to ensure the disclosure of material information. ¶ 192. Defendants concede, as they must, that such certifications establish scienter where, as here, the pleading contains particularized allegations implying that the certifications were not honestly and reasonably believed to be true when made. Defs. Mem. at 22. *See In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 742-43 (E.D. Mich. 2007) (SOX certifications gave rise to an inference of scienter because they provided evidence that the individual defendant "either knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").

[12] Although most of the information concerning the Lulla family's self-dealing transactions came from other sources, that information is supported by CW2, an Indian film producer with personal knowledge of the Company's business practices in the period immediately leading up to the Class Period, as a result of his work co-producing films with Eros, including at least one film released in 2011. ¶ 55. According to CW2, Eros channels money to family members through dummy production deals. According to CW2, 30-40% of Eros's acquisition and production occurs through NextGen, owned by Kishore Lulla's brother-in-law Puja Rajami. NextGen signs the co-production agreements with EIM, and Eros makes payments to EIM, which, in turn, makes payments to NextGen to produce the films. Thus, NextGen collects money on films but provides no added value, according to CW2. CW2 also averred that NextGen employees use Eros's offices and do little other than make a margin on the film. CW2 also averred that Lulla's wife also receives advances as a producer. ¶¶ 187-188. Defendants' argument that the Individual Defendants other than Lulla lack scienter because they were not parties to the self-dealing transactions (Defs. Mem. at 18 & n.24) is unavailing when those individuals are alleged to have formed a tight-knit group with Lulla (¶ 185), raising a strong inference that all Individual Defendants knew of the financial condition caused by the self-dealings of Lulla and his family and participated in the fraud with Lulla. *See Cotter v. Gwyn*, Civ. No. 15-4823, 2016 WL 4479510, at *9 (E.D. La. Aug. 25, 2016) (co-defendants' knowledge of other defendant's conflict of interest supported inference of scienter).

do not allege that the self-dealing transactions were themselves the subject of misstatements.[13]

*See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 272 (S.D.N.Y.

2004) ("Although it was disclosed, this conflict of interest reasonably could have supplied a

motive for PwC's alleged misrepresentations.").  Indeed, suspicious or unusual insider stock

sales are routinely alleged to plead motive, and those sales are disclosed.

## III.   PLAINTIFFS SUFFICIENTLY PLEAD LOSS CAUSATION

Defendants' challenge to Plaintiffs' particularized loss causation allegations (¶¶ 144-166,

289-292) also fails.  *See* Defs. Mem. at 23-25.  A securities fraud plaintiff can plead loss

causation by alleging that he "purchased securities at an inflated price and that the price dropped

once the fraud became known."  *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336

(S.D.N.Y. 2014) (citing *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d

Cir. 2012)).  "There is no requirement that corrective disclosures emanate from the company

itself, so long as the truth is disclosed in some fashion."  *In re Initial Pub. Offering Sec. Litig.*,

544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  "[A] short and plain statement that provides the

defendant with notice of the loss and its causal connection to the alleged misconduct is . . .

sufficient to assert loss causation; pleading the elements with particularity is not required."

*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015).[14]

Defendants argue that the corrective disclosures—found in Wells Fargo's October 23,

2015 analyst report titled "EROS: Stepping To The Sidelines—Downgrading To Market

---

[13] In *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2011 WL 536437, at *9 (S.D.N.Y. Feb. 9, 2011), *aff'd*, 690 F.3d 98 (2d Cir. 2012), on which Defendants rely, the court found that scienter was not pleaded because there was disclosure of the matter supposedly misrepresented – not, as here, disclosure of facts independent of the fraud establishing Defendants' motive to commit fraud.

[14] *See also In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015) ("On a motion to dismiss, all that is required is 'some indication of the loss and the causal connection that the plaintiff has in mind.'") (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) ("[T]he vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8.").

Perform" (¶¶ 152-154; Defs. Ex. 11) and the *Seeking Alpha* articles by Alpha Exposure dated

October 30, November 10, and November 13, 2015 (¶¶ 156-157, 160-161, 164; Defs. Exs. 12-

14)—are not curative because they (1) only discuss public information and do not reveal

anything new, and (2) do not sufficiently contradict Defendants' alleged misstatements regarding

the ability of registered users to make actual use of Eros Now.

 The Wells Fargo report, prepared by sophisticated market participants, is not based solely

on public information.  It followed a nonroutine – and ***nonpublic*** – conference call that Eros

management had held with Wells Fargo and other ostensibly friendly "sell-side" analysts that

morning to try to allay their mounting concerns about the Eros Now user count.  ¶¶ 152-153.

Moreover, Wells Fargo's attempt to verify management's assurances about the Eros Now user

count, some of which were made during the private "sell-side" call, was based on data from App

Annie and other websites that track mobile app downloads.  ¶ 154.  Wells Fargo's audit is not

public, nor is the underlying App Annie or other industry data; App Annie is a commercial

service that provides data for a fee.  ¶ 96.

 Further, Defendants do not contest the materiality of the 17% stock drop in reaction to the

Wells Fargo report, nor do they identify any intervening events or market-wide downturns that

potentially could sever the causal link.  ¶ 155; *see Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d

462, 471 (4th Cir. 2011) ("Corrective disclosures must present facts to the market that are new,

that is, publicly revealed for the first time, because, if investors already know the truth, false

statements won't affect the price.") (citation omitted).  Thus, Wells Fargo's downgrading of the

stock based in part on research reflecting continued "uncertain[ty] about the Eros Now user

count," raising "a red flag for investors," was new and market-moving information.  ¶ 154.[15]

---

[15] Defendants' suggestion that Plaintiffs "mischaracterize" Wells Fargo's coverage of Eros before October 23,
2015 (Defs. Mem. at 24-25) is wrong and has no bearing on loss causation.  Plaintiffs have no obligation to allege

The Alpha Exposure articles, similarly, are not mere "journalists' opinions" or recitations of old news.  Alpha Exposure's deep, detailed research and investigation shows that its views and conclusions are based on analysis of a range of facts drawn from multiple sources, some of which are not readily available to the public, and accordingly reflect new information entering the market.[16]  The uncontested market reactions to all three Alpha Exposure articles, and the press releases Eros promptly issued in response to the first two, further show that the Alpha Exposure articles contained new and market-moving information.  ¶¶ 158-159, 162-163, 165.  Indeed, while Defendants suggest that the corrective disclosures are "refuted" by these and other public disclosures (Defs. Mem. at 23), they do not and cannot argue that the corrective disclosures were previously disclosed by Eros.  *Cf. Fila v. Pingtan Marine Enter. Ltd.*, No. 15-CV-267 (AJN), 2016 WL 3962015, at *5 (S.D.N.Y. July 19, 2016) (Nathan, J.) (noting that fact reported in *Seeking Alpha* article had been disclosed in defendant company's filings).[17]

The multiple red flags raised by Wells Fargo and Alpha Exposure concerning the veracity of the number of Eros Now "registered users" support loss causation with respect to Plaintiffs' allegation that "registered users" could not make meaningful use of the service.  *E.g.*, ¶¶ 91-93,

---

any particular analyst report or rating.  In any event, the October 23 analyst report makes clear that Wells Fargo lost confidence in Eros and "stepped to the sidelines" following the call held with sell-side analysts that morning, ***after*** the October 14 and 16 reports that Defendants cite.  ¶¶ 152-153.

[16] *E.g.*, ¶ 157; Nov. 10, 2015 Alpha Exposure article, Defs. Ex. 13, at 2/23 ("Eros does not disclose the names of all of its films, which if our assertions are correct, is obviously something it cannot do since it would not have produced the claimed number of films.  This made our research project of identifying the number of films distributed by Eros more difficult.  We broke our project into a few steps.  First, we employed the service of a consultant to compile a complete list of movies and the associated box office revenue. . . .  Second, we went through a laborious process to determine any remaining universe of movies associated with Eros. . . .  We then identified all 154 movies on ErosNow that were released between 2013 and 2015. . . .").

[17] The "Sacerdote" article that this Court found noncurative in *Pingtan* was different than the Alpha Exposure articles here.  Sacerdote unambitiously "sought to summarize a few points from the company's SEC filings and make [his] best interpretation," offered only "a personal opinion," disclaimed financial expertise, and cautioned readers to "rely on their own due diligence drawn from the original source documents."  *Pingtan*, 2016 WL 3962015, at *5.  Sacerdote also emphasized, in contrast to Alpha Exposure, that he was not accusing the company or its management of any wrongdoing with regard to the issues later raised in the complaint.  *Id.* at 6; *cf.* ¶ 157 (Oct. 30, 2015 Alpha Exposure article: "investors have been misled regarding Eros Now"), ¶ 164 (Nov. 13, 2015 Alpha Exposure article: "the company has misled investors by putting old movies onto its list of films it released").

96, 114; *see Katyle*, 637 F.3d at 472 (noting courts' rejection of "fact-for-fact disclosure" requirement for loss causation after *Dura*).  What value does a base of 14, 19, or 30 million "registered users" bring to Eros stock if they cannot use the Eros Now service?  *See* ¶ 154 (Wells Fargo report: "We can't reconcile the disparity and it's a red flag for investors—so until we see some ***meaningful monetization*** from Eros Now, we have a tough time giving credit for it in our valuation."); ¶¶ 62, 111-113.

Last, Defendants' assertion that the Alpha Exposure articles cannot be corrective because the author is a short seller confuses the substance of the information reported with the credibility of the reporter.  Defendants' own cited authority affirms that "[t]o be sure, a short seller's report can constitute a corrective disclosure if the report reveals accurate information about a company that exposes actual misstatements by the company." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) (citing *In re Winstar Commc'ns*, No. 01-CV-3014 (GBD), 2006 WL 473885, at *12-15 (S.D.N.Y. Feb. 27, 2006)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *see also Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) ("A short seller report may be used to establish loss causation.").  Alpha Exposure is neither wrong nor unreliable merely because it owned (and disclosed) a short position in Eros.

## IV.   PLAINTIFFS STATE CLAIMS FOR CONTROL PERSON LIABILITY

Defendants challenge the Section 20(a) control person liability claims on the sole ground that Plaintiffs have not pleaded a primary violation of Section 10(b).  *See* Defs. Mem. at 25. Because Plaintiffs have stated primary violations as discussed above, and Plaintiffs' scienter allegations also plead the Individual Defendants' culpable participation, Plaintiffs' Section 20(a) claims must be upheld.  *See In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 WL 2572088, at *4 (S.D.N.Y. Sept. 7, 2007) ("Because the only ground argued for dismissing the Plaintiffs' claim under Section 20(a) was the absence of a predicate violation of Section 10(b),

the motion to dismiss that claim is also denied."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634

(S.D.N.Y. 2014) ("[T]he scienter allegations against [the individual defendants] are more than

sufficient to constitute 'culpable participation.'").[18]

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants'

motion to dismiss in its entirety.

Dated:  December 13, 2016                        Respectfully submitted,

                                                LABATON SUCHAROW LLP

                                    By:      */s/ Michael W. Stocker*
                                             Michael W. Stocker
                                             mstocker@labaton.com
                                             David J. Goldsmith
                                             dgoldsmith@labaton.com
                                             Barry Michael Okun
                                             bokun@labaton.com
                                             Alfred L. Fatale III
                                             afatale@labaton.com
                                             140 Broadway
                                             New York, New York  10005
                                             Tel.: (212) 907-0700
                                             Fax: (212) 818-0477

                                             *Attorneys for Lead Plaintiffs*
                                             *Fred Eisner and Strahinja Ivoševič*
                                             *and Lead Counsel for the Class*

---

[18] This Court has personal jurisdiction over Defendants Lulla, Deshpande, and Heffernan regardless of whether they live in the United States.  *See* Defs. Mem. at 25 n.33.  "United States courts frequently have asserted personal jurisdiction over [foreign] individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors."  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 351-52 (D. Md. 2004); *see also Itoba Ltd. v. LEP Grp. PLC*, 930 F. Supp. 36, 41 (D. Conn. 1996) (personal jurisdiction existed over foreign defendant who approved forms knowing they would be filed with SEC and relied on by U.S. investors).  The Complaint alleges exactly this with respect to these (and all) Individual Defendants.  ¶¶ 43-46, 192, 196, 209, 217, 220, 235, 250, 253, 262, 334.  The plaintiffs in *In re Satyam Computer Services Ltd. Securities Litigation*, 915 F. Supp. 2d 450, 485 (S.D.N.Y. 2013), in contrast, alleged that the foreign individual defendants "participated in a de facto conspiracy" but did not "link" the individuals to the false statements at issue.