USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 2 2 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Eros International Securities Litigation

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Master File: 15-CV-8956 (AJN)

<u>MEMORANDUM & ORDER</u>

ALISON J. NATHAN, District Judge:

Now before the Court is a motion to dismiss a consolidated class complaint for securities fraud. For the following reasons, the Court GRANTS the Defendants' motion.

**I.   Background**

Between November 2015 and January 2016, a number of putative class actions were filed against the same corporate and individual defendants. *See* 15-cv-08956, Dkt. No. 1; 16-cv-00223, Dkt. No. 1; & 16-cv-03772, Dkt. No. 1. On April 5, 2016, this Court consolidated the actions, named as lead plaintiffs Fred Eisner and Strahinja Ivoševič ("Lead Plaintiffs"), and approved their choice of counsel. 15-cv-08956, Dkt. No. 34. The Court named the consolidated action "In re Eros International Securities Litigation" and ordered everything to be filed under this Master File number. Dkt. No. 35. Shortly thereafter, one of the actions, which had been filed in the District of New Jersey was transferred and consolidated as well. Dkt. No. 54. The consolidated class then filed an amended complaint on July 15, 2016. Dkt. No. 60. Defendants' filed their first motion to dismiss on August 29, 2016, Dkt. No. 62, after which this Court gave leave to Plaintiffs to amend their complaint. Dkt. No. 65. Plaintiffs amended.

1

The present Amended Complaint was filed on October 10, 2016. Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Am. Compl."), Dkt. No. 68. Defendants filed the present Motion to Dismiss on November 11, 2016. Dkt. No. 71.

### A.      Factual Summary

Lead Plaintiffs bring various securities actions on behalf of a putative class of persons and entities who purchased or otherwise acquired the publicly traded common stock of Eros International Plc ("Eros" or "Defendant") between November 12, 2013 and November 12, 2015. Am. Compl. ¶ 1. Eros is an Indian film entertainment, or "Bollywood," company that produces, acquires, and distributes Indian-language films in theatrical, television, and digital formats worldwide. *Id.* ¶¶ 2, 37, 48. Eros International Media Ltd. ("EIM") was founded in 1977 by Arjun Lulla; in June 2006, Arjun Lulla transferred control of EIM to his son, Kishore Lulla, who formed Eros as a parent company for EIM and its affiliates. *Id.* ¶¶ 3, 36, 49.

Certain former and current Eros executives are also named as individual defendants. Defendant Kishore Lulla served as Chairman of the Board of Directors during the relevant time period. *Id.* ¶ 38. Defendant Jyoti Desphande served as Chief Executive Officer and Managing Director of Eros during the relevant time period. *Id.* ¶ 39. Defendant Andrew Heffernan served as Chief Financial Officer of Eros from May 2006 until May 28, 2015. *Id.* ¶ 40. Defendant Prem Parameswaran has served as the Chief Financial Officer and President for North America since May 28, 2015. *Id.* ¶ 41. Together, Lulla, Desphande, Heffernan, and Parameswaran are referred to as the "Individual Defendants."

In August 2012, Eros launched Eros Now, a streaming service akin to Netflix through which users and subscribers could access films and other content on demand through internet-enabled devices like mobile phones and computers. *Id.* ¶ 5. Under Plaintiffs' theory, members of the Lulla family had been looking for a way to increase their own economic benefits from the company and could do so by accessing the public capital markets, but only if "they could convince investors that Eros had genuine opportunities to expand its business in the highly

competitive and rapidly developing media market." *Id.* ¶ 4. Eros Now was this persuasive enterprise, and according to Plaintiffs, Eros executives saw its success as "crucial to the success of Eros's U.S. initial public offering ("IPO"), commenced in November 2013." *Id.* ¶¶ 5-6.

Eros Now was initially offered as a free streaming service, as Eros's strategy was to build up a large user base that would later be converted, or "monetized," into a fee-paying pool of subscribers. *Id.* ¶ 7. To further this strategy, Eros acquired an Indian mobile platform called Techzone, which mainly sold ringtones for earlier-generation mobile phones, thereby obtaining the right to market Eros Now to Techzone customers. *Id.* ¶ 8.

Plaintiffs claim that "[i]nvestors were led to believe that the Company's move to convert Techzone customers to 'users' of Eros Now's streaming content was successful." *Id.* ¶ 13. On February 17, 2015, Eros announced that Eros Now's "registered users" had jumped from 2.9 million to 14 million, mainly as a result of its acquisition of Techzone. *Id.* Again on June 10, 2015, Eros announced a further increase to 19 million registered users. *Id.* A mere four months after that, it reached 30 million. *Id.* According to Plaintiffs, who cite analyst reports from Jefferies and Wells Fargo, the growing "registered user" numbers touted by the Company helped drive the stock to all-time highs in July and August 2015. *Id.* ¶¶ 15-16.

The problem with this – and a fact central to Plaintiffs' case – was that for Techzone customers to actually stream content on Eros Now, they would need a device with this ability. *Id.* ¶¶ 9-10. While streaming could happen through a downloadable mobile application ("app") or through wireless access to the internet, India's mobile phone technology and available data networks were several years behind the United States. *Id.* ¶¶ 10-11. As such, most mobile phones in use in India during the class period were unable to download apps or access full-data internet websites; instead they could only access stripped-down websites via Wireless Access Protocol ("WAP"). *Id.* ¶ 11. Because of WAP's technical limitations, streaming would be difficult and characterized by poor resolution, frequent interruptions for buffering, and long download times. *Id.* ¶ 12.

As Plaintiffs' plead, although Defendants knew the vast majority of these "registered users" were unable to access Eros Now's content in "any meaningful way owing to the limits of broadband internet penetration in India and the technological limitations of WAP browsers," they touted the numbers to misleadingly fan investor enthusiasm. *Id.* ¶¶ 13, 14, 17.

Plaintiffs make a similar argument about Eros Now's representation of the films in its portfolio. In sum, they allege that Defendants made "materially false and misleading statements" regarding the overall number of films and newly produced and added films the Company made available for Eros Now users, figures that "were crucial for investors, for the streaming service is only as good as its content." *Id.* ¶ 122.

According to Plaintiffs, when the truth about the nature of these "registered users," and about the films Eros Now had made available, started to emerge, Eros stock began to tumble, harming Lead Plaintiffs and other Class members. *Id.* ¶¶ 22-30.

The first cause of action, for a violation of Section 10(b) of the Securities Exchange Act of 1934, and of SEC Rule 10b-5 promulgated thereunder, charges that Eros engaged in fraudulent or deceptive acts and practices that artificially inflated Eros's securities prices. *Id.* ¶¶ 310-11. Plaintiffs seek to hold Eros liable for materially false and misleading statements, and for omissions of material adverse information, actions they claim were made with corporate scienter, and which ultimately harmed the members of the Class who acted in reliance. *Id.* ¶¶ 312-20.

The second cause of action is virtually the same as the first, but asserted against the Individual Defendants. Plaintiffs claim these individuals had control of Eros during the Class Period, had knowledge of or access to material information about Eros Now, and were aware that the Company's dissemination of information to the investing public was materially false and misleading. *Id.* ¶¶ 321-32.

The third and final count is also asserted against the Individual Defendants for violation of Section 20(a) of the Securities Exchange Act of 1934. This claim centers on Individual Defendants' positions as "controlling persons" who had "the power to control or influence the

4

particular transactions giving rise to the securities violations alleged herein," namely, the dissemination of statements alleged to be materially false and misleading. *Id.* ¶¶ 333-36.

Plaintiffs ask for class certification under Rule 23 of the Federal Rules of Civil Procedure, and seek damages, expenses, and any equitable relief the Court deems proper.

### B.  Motion to Dismiss

On November 11, 2016, Defendants moved to dismiss the action in its entirety. Dkt. No. 71. As Defendants tell it, a "self-interested short seller disseminated a series of false rumors and misinformation about Eros's business and accounting practices," helping drive the stock price down. Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Class Action Complaint ("Br."), Dkt. No. 72, at 1-2. In response, Eros's Audit Committee hired Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to conduct an internal review; Skadden concluded that Eros did not commit any wrongdoing. *Id.* at 2. Nonetheless, a number of actions – consolidated here – were filed while the internal review was ongoing. *Id.*

Defendants argue that Plaintiffs have failed to allege *any* affirmative misrepresentations, pointing to various cautionary statements the company made during the Class Period. *Id.* at 2-3, 8-11. Similarly, they challenge Plaintiffs' allegations of material omissions, and defend certain statements as mere puffery or as non-actionable forward-looking statements. *Id.* at 13-16. They further argue that Plaintiffs offer inadequate proof of either corporate or individual scienter. *Id.* at 3, 16-22. Finally, Defendants allege that Plaintiffs fail to adequately plead that any misrepresentations led to their loss, as the negative articles do not constitute a corrective disclosure. *Id.* at 3, 23-25.

Plaintiffs filed opposition to Defendants' motion. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Consolidated Class Action Complaint ("Opp."), Dkt. No. 74. Completing the submissions, Defendants filed a reply largely reiterating

their earlier arguments. Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Class Action Complaint ("Reply"), Dkt. No. 77.

The preceding factual summary is not exhaustive; specific details of Eros's public statements, and other relevant facts, are discussed below.

## II. Legal Standard

When a party moves to dismiss under Rule 12(b)(6), the pleading will withstand the motion so long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Regardless of the level of factual detail provided, if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," then the Court will dismiss the case. *Twombly*, 550 U.S. at 558. A court evaluating a motion under Rule 12(b)(6) must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N. Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (quotation marks and citation omitted). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Although pleading most claims requires only that a party provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), claims of fraud are required by Rule 9(b) to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, a party alleging fraud must "(1) specify the statements that the [claimant] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quotation marks and

6

citation omitted). Additionally, because the complaint alleges securities fraud, Plaintiffs must also plead scienter (the intention to deceive, manipulate, or defraud) with particularity, as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). To plead scienter with particularity, a complaint must "with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u–4(b)(2)).

In addition to the text of the complaint, the Court may consider documents attached as exhibits, incorporated by reference, or that are "integral" to the complaint, as well as public SEC filings. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).

### III. Discussion

#### A. Plaintiffs' 10b-5 Claim against Eros

In order to establish a claim for securities fraud under Rule 10b–5, a Plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." *Fragin v. Mezei*, 09-CV-10287(AJN), 2012 WL 3613813, at *7 (S.D.N.Y. Aug. 22, 2012) (quoting *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000)).

Because the Court finds that Plaintiffs fail to adequately plead the first element – making false material representations or omitting to disclose material information – the Court foregoes analysis of the other elements: scienter and loss causation.

### 1. Defendants' Statements Regarding "Registered Users" Are Not Material Misrepresentations nor Omissions of Material Fact

Despite Plaintiffs' voluminous complaint, their argument largely boils down to one simple claim: that a person cannot be a "registered user" if he or she cannot meaningfully make "use" of the product.

The Amended Complaint points to a number of similar statements made by Eros during the Class Period that Plaintiffs argue were misleading. For example:

- On an February 17, 2015 Earnings Call, Deshpande stated: "We're pleased to announce that Eros Now has over 14 million registered users worldwide, which comprises of free, transactional and premium users. Out of this, just over 10 million are mobile users, mainly transactional WAP users in India who we were able to successfully convert through our TechZone relationship." Am. Compl. ¶¶ 77, 247.
- On a June 10, 2015 Earnings Call, Deshpande announced: "Our prelaunch phase of Eros Now has been very successful, with 19 million registered users globally, up 35.7% from the 14 million registered users we announced in Feb 15. …So 19 million subs is a global number…. But out of this, around 15.5 million or just over 15 million subs are – sub registered users are India and just over 3.5 million are outside of India. So we're picking up a lot of registered users from India." *Id.* ¶¶ 80, 257.
- On an August 18, 2015 Earnings Call, Deshpande stated: "We are pleased to announce that as of end July, Eros Now has 26.5 million registered users worldwide, which comprises of free, transactional and premium users, a 38% growth to the numbers that we previously announced." *Id.* ¶¶ 82, 268.

Plaintiffs argue that these statements – touting an increase in "registered users" of Eros Now – are misleading based on their conception of what it means to be a "registered user." The complaint pleads, "While [Eros] did not define the term 'registered user,' the term refers in the internet technology field to persons who not only register to access a website, but who also interact with the website to extract some benefit. The 'user' element of 'registered user' was critical information for securities analysts and other market participants, who were looking for evidence that the Company was building a base of customers who not only had registered to use Eros Now, but also who could actually *use* Eros Now by viewing film content, first for free and later for a fee." *Id.* ¶ 62 (emphasis in original).

8

Plaintiffs continue that because of the limitations of the Internet and phone technology in India, whether a registrant accessed the platform through WAP, through the mobile app, or through HTML websites, "[n]one of these ... 'registered users' made meaningful use of the Company's streaming movies-on-demand services." *Id.* ¶¶ 91-92. Plaintiffs emphasize the "user" aspect of "registered user" throughout the complaint. *See, e.g., id.* ¶¶ 19, 84, 91-92; *see also* Opp. at 7-10. Plaintiffs also cite a litany of publicly available data to support its contention that these "users" could not make "meaningful use" of the service. This data includes (1) a November 2015 study by the GSM association of mobile coverage in India; (2) data collected by App Annie, a commercial service that records and aggregates the numbers of downloads that mobile apps receive on a monthly basis; and (3) data from SimilarWeb, a commercial service that records and aggregates the duration of "hits" and visits that websites receive on a monthly basis. Am. Compl. ¶¶ 90, 96-105, 107-114. The story Plaintiffs tell about these users inability to actually stream movies is quite compelling. Unfortunately for them, it is also largely immaterial.

Plaintiffs' argument that the registered users Eros touted were not able to make real "use" of the platform is definitionally flawed. Plaintiffs cite Wikipedia in arguing that the term "user" within "registered user" means "a person who interacts with a system, typically through an interface, to extract some functional benefit." Opp. at 9. The definition accepted by one court of "registered user" – "a person who has previously been registered with a registration server" – is equally plausible and does not reach the concept of a "functional benefit." *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phoenix Inc.*, No. 2:09-CV-555, 2010 WL 11450408, at *20 (E.D. Va. June 10, 2010). Nonetheless, this semantic battle is beside the point, as Plaintiffs cannot import the word "meaningful" before "use" absent some representation on the part of the Defendants about the quality of registrants' use. Moreover, many users did derive some sort of functional benefit, such as by purchasing a ring tone. *See* Br. at 10 n. 9. In fact, Plaintiffs cite Deshpande telling investors that "a large number of [the users] would have made some transaction or the other, [of] some value" even if they "are not regularly monthly subscribers."

9

Am. Compl. ¶ 248. While the functional benefit many users derive may not have been that of streaming entire movies, these "pay as you go" customers still "use" the platform. *Id.*

In the absence of a shared definition of the term "registered users," Plaintiffs must identify affirmative statements made by Defendant about the quality of users use that can plausibly be construed as false or misleading. As Defendants correctly note, "the amended Complaint does not allege that Defendants made any affirmative misrepresentations to shareholders regarding the...'meaningful use of Eros Now's services.'" Br. at 8. As provided above, on a February 2015 earnings conference call Defendants readily conceded that the vast majority of their "users" were WAP users. Am. Compl. ¶ 77. Defendants never made any claim that these users experienced a large, quality picture, or quick download speed. Br. at 8.

And Defendants did, at various times, caution investors about the impact India's technology would have on their business. For example, in Eros's FY 2014 Annual Report, the company lists as one of the risks related to its business: "Our ability to remain competitive may be adversely affected by rapid technological changes and by an inability to access such technology." Ex. 6 at 11-12. In its FY 2015 Annual Report, Eros lists the same risk, buttressed by the specific concern that "if the [digital distribution] methods that we adopt are not as...widely accessible...to consumers as those adopted by our competitors," their Eros Now platform "may not achieve the desired growth rate." Ex. 3 at 10.[1] During an earnings calls in August 2015, Deshpande spoke about technological limitations beyond Eros's control, saying, respectively, "we want to ...convert a large percentage of the user base very quickly to premium subscription. Of course, all of the things are not under our control alone, 4G growth has to happen, broadband growth has to happen. So the user experience is not just a function of all the cool things that we do. It's also a function of broadband and bandwidth." Ex. 15 at 5. Similarly,

---

[1] Plaintiffs do not object to Defendants' use of reports outside the pleadings, however, in any event, the Court may also consider facts of which judicial notice may be taken. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Documents filed with the SEC may be judicially noticed for the purposes of showing that such information was publicly available. *Garber*, 347 F. App'x at 669.

10

during an earnings call in February 2014, Deshpande said, "we believe that the quickest and lowest hanging fruit of monetizing traffic from India is from the business or advertisers and brands, rather than the consumer itself in the – in the next two to three years. And that may change once 3G, 4G and broadband penetration becomes more effective within India." Ex. 16 at 6. Plaintiffs' Amended Complaint notes a similar statement made by Rishika Lulla Singh, head of Eros Digital, during Eros's Investor Day Conference in October 2015: "What's India's structural landscape? Today, we have over 150 million smartphones. That's absolutely huge. However, Internet penetration is only at 19%, broadband even lower at 8%." Am. Compl. ¶ 85.

Similarly, Plaintiffs argue that Defendants' disclosures "failed to warn" investors that "registered users" could not make "meaningful use" of Eros Now. Am. Compl. ¶ 312-13; Opp. at 10. In general, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Disclosure is not required simply because an investor might find the information relevant or of interest. *See Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152–153 (2d Cir. 2013) (citing *Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir. 2002)). A duty to disclose under Rule 10b–5 may arise either "(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (citing 17 C.F.R. § 240.10b-5(b)). The Court is unaware of any independent statute requiring disclosure, and the second type of duty essentially repeats the above inquiry.

While the summary order in *Boca Raton Firefighters and Police Pension Fund v. Bahash* does not bind this Court, its facts are illustrative. 506 F. App'x 32 (2d Cir. 2012). In *Boca Raton*, the District Court found that "plaintiffs challenge [Defendant's] financial reports because the overly positive statements describing those numbers were misleading in light of the concealed manner in which they were achieved. But plaintiffs admit that the reported earnings figures were accurate, and a defendant's failure to disclose that its earnings were unsustainable is not securities fraud." *Reese v. McGraw-Hill Cos., Inc.*, No. 08-CV-7202, 2012 WL 9119573, at

11

*2 (S.D.N.Y. Mar. 30, 2012) (internal quotations and citations omitted). A similar situation exists here. Defendants' figures are not plainly inaccurate, however Plaintiffs argue that Defendants knew their optimism was misleading given the limited number of users truly able to watch a full-length Bollywood movie through Eros Now. As the Second Circuit held in *Boca Raton*, affirming the lower court's decision, "general expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.'" 506 F. App'x at 38 (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

Similarly, in *Altayyar v. Etsy, Inc.*, plaintiffs alleged securities fraud based on the claim that Etsy misrepresented its number of members and active sellers because they knew that a portion of them were large-scale counterfeiters and sellers infringing on property rights. No. 15-CV-2785, 2017 WL 1157193, at *11 (E.D.N.Y. Mar. 16, 2017), *appeal docketed*, No. 17-1180 (2d Cir. Apr. 21, 2017). Etsy's Prospectus did not suggest that Etsy would adjust the total number of sellers for estimated infringement rates, so investors "were thus apprised of the potential that infringing sellers might be included in the number of total sellers listed in Etsy's financial report," and plaintiffs "provide[d] no basis for the assertion that the [Defendants] deliberately failed to [adjust metrics] in order to mislead investors." *Id.* at *12. Here too, Defendants *could have* defined and reported "users" in an alternate way that took into account the specifics of their use, but that does not amount to misrepresentation.

Plaintiffs also cite a number of analyst reports in arguing that the investment community was misled by Defendants' statements. *See, e.g.*, Am. Compl. ¶¶ 76 ("Jefferies stated in a report dated November 13, 2014: 'We see this deployment as the key for the stock to work, and are encouraged by sub[scriber] growth to date."), & 83 ("Jefferies stated in a report dated August 13, 2015: "the major takeaway [is] that Eros Now grew its subscriber base by 7.5M in the quarter, taking the total to +26.5M. …Next Step: Monetization."). These cherry-picked statements do not alter the Court's conclusion that an objectively reasonable investor would not have been materially misled in light of Eros's broader disclosures. *See supra* p. 10. Moreover, these analyst statements can cut both ways, as Wells Fargo reported on October 23, 2015 that "Mgmt.'s point

12

of view is that these are almost entirely WAPP [sic] users that register thru [sic] phone numbers or email addresses. The problem is that we can't verify it, even if it's the predominant method of phone usage in India." *Id.* ¶ 154.

Defendants repeatedly disclosed to investors the challenges technological development in India posed to their growth, including that the vast majority of their users were WAP users. Defendants did not make affirmative representations with respect to the quality of the users' experiences. And Defendants had no independent, affirmative "duty to warn." As such, the Court cannot find a material misrepresentation or material omission with respect to the registered users.

### 2. Defendants' Statements Regarding Their Film Library Are Not Material Misrepresentations

Alternatively, Plaintiffs allege that Defendants made certain material misrepresentations with respect to their film library on Eros Now. Among the statements Plaintiffs deem false are:

- Press Release from 6/10/15, filed with the SEC on 6/12/15 as an attachment to a Form 6-K: "We released 65 films in fiscal 2015...." Am. Compl. ¶ 129.
- Form 20-F filed with the SEC on 7/9/15 claimed a release of 65 films in fiscal year 2015 and 69 in fiscal year 2014. *Id.* ¶ 130.
- Form 20-F filed with the SEC on 6/17/14 claimed a release of 69 films in fiscal year 2014. *Id.* ¶ 218.

In labeling these statements as false, Plaintiffs rely on Defendants' publication in November 2015 of an "exhaustive" list of its fiscal 2015 and fiscal 2014 releases on its website. *Id.* ¶ 138. Plaintiffs report that Defendants only list 64 and 68 films for FY 2015 and FY 2014 respectively, one fewer film each year. *Id.* ¶ 138-39. Defendants do not rebut the slight discrepancy in the total number, but to sufficiently plead securities fraud, this misrepresentation would also have to be material.

Determination of materiality under the securities laws is a mixed question of law and fact the Supreme Court has considered especially "well suited for jury determination." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)), *cert. denied*, 502 U.S. 813 (1991). A misrepresentation is material under Section 10(b) of the Securities Exchange Act and Rule 10b-5 where there is "a substantial

13

likelihood that a reasonable investor would find the…misrepresentation important in making an investment decision." *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013), *cert. denied*, —— U.S. ——, 134 S. Ct. 684 (2014). Nonetheless, where misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," a court may find the misstatements immaterial as a matter of law. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 131 (2d Cir. 2011) (quotation marks and citation omitted).

Here, as Defendants note, Plaintiffs' make no allegation that this misstatement affected revenues or investors' deliberations. Br. at 13 n.13. They point to no investment decision made in which the difference between Eros's release of 64 or 65 films in fiscal year 2015 would have been important. The Court considers these misstatements so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

Additionally, Plaintiffs claim that Defendants misrepresented that these films were released in those years, when 20 films on the 2015 list were not released during FY 2015, and 17 films on the 2014 list were not released during FY 2014. Am. Compl. ¶ 139.

Defendants do oppose Plaintiffs' claims regarding release dates. They cite numerous public statements in which Eros disclosed that it "acquired over 90% of [its] film content through contracts with third parties" and that "references to 'film releases' refer to theatrical releases or, for films that we did not theatrically release, to our initial DVD, digital or other non-theatrical exhibition." Br. at 12-13 (collecting instances). As with "registered users," Plaintiffs essentially allege that their meaning of the phrase "new release," meaning that the film was originally released in that year, must trump Defendants' understanding. Defendants argue they meant "new releases" as newly released *on* the Eros Now platform, and they point to statements that indicate as such.[2] *See* Br. at 11-12 (collecting instances).

---

[2] To the extent that statements made about "new films," *see, e.g.* Am. Compl. ¶¶ 210, 225, 236, 254, 277, differ from those made about "new releases," Plaintiffs waive the argument by failing to raise it their memorandum in opposition.

14

Plaintiffs fail to sufficiently plead that Defendants' statements constitute "false material representation[s]," the first element of a 10b-5 claim. *Rothman*, 220 F.3d at 89. In this second semantic battle, they again cite analyst reports for the proposition that the investment community was misled by Defendants' statements about their film library. *See, e.g.*, Am. Compl. ¶ 131 (Jefferies on July 31, 2014: "As we look to the future, we project that Eros will release ~70 films/year...."). But it is no more plausible that these statements were interpreted to mean new films than that they were interpreted to mean newly released on the Eros Now platform. As with their argument on Defendants' statements about "registered users," Plaintiffs have "not nudged their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Finally, Plaintiffs allege that Eros misrepresented the number of films it had in production. Am. Compl. ¶¶ 141-43. Specifically, Plaintiffs rely on the testimony of a confidential witness – "CW2" – who claims that the Eros website listed 24 films as being "in production" as of December 2015 that were not being produced. *Id.* ¶ 142.

These pleadings are deficient in two respects. First, the investor statements they cite for proof of materiality are forward-looking. The Private Securities Litigation Reform Act (or "PSLRA") created a safe harbor for companies' forward-looking statements, including those related to "plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(1)(B). For example, Plaintiffs cite two investor statements from August 18, 2015 that focus on Eros's remarks about film production. *See* Am. Compl. ¶¶ 135 (Macquarie: "Eros announced today it is ramping up production from ~70 films annually to 100-120 over the next few years...") & 136 (Jefferies: "Mgmt. expects to grow total films to 100-120 per year over the course of the next 3 to 5 years."). These statements are based on the earnings call Eros held that same day. At the beginning of that call, the operator stated: "The Company would like to remind everyone listening that during this call, it will make forward-looking statements under the Safe Harbor provisions of the federal securities laws. The Company's actual results might differ materially from those projected in the forward-looking statements." Ex. 15, at 1. The content of

15

the statement also clearly marks it as forward-looking. *Id.* at 2 ("What you will see starting this year is a systematic strategy which will continue for the next five years to firstly scale our film slate from 65 to 70 films currently to over 100 to 120 films across the next three to five years, across Hindi as well as multiple regional languages.").

Second, to the extent Eros made misrepresentations about the number of films it was *presently* producing, Plaintiffs fail to cite those with particularity outside of one particular example, *Sarkar 3*. *Id.* ¶¶ 141-143. With respect to that film, Eros represents that the delay in its production was "unexpected," and point to warnings made in SEC filings that film productions face "substantial" risks, including "delays, cost overruns, cancellation or abandonment of the completion or release of films." Br. at 21 n.29 (citing Ex. 3 (FY 2015 Annual Report) at 4; *id.* at 30). Given the general conclusory nature of Plaintiffs' allegations with respect to films in production and the disclaimers issued by Eros, the Court cannot find a sufficiently pleaded misrepresentation. Moreover, even assuming *arguendo* that Eros's statements about *Sarkar 3* constitute misrepresentation, Plaintiffs do not allege "a substantial likelihood that a reasonable investor would find the…misrepresentation important in making an investment decision." *Vilar*, 729 F.3d at 89.

For these reasons, Defendants' statements about their film library and film production are not material misrepresentations.

### 3. While Defendants also Argue that Plaintiffs Fail to Allege Corporate Scienter and Loss Causation, the Court Declines to Address

Defendants also challenge the sufficiency of Plaintiffs' pleadings with respect to the second and third elements of a 10b-5 claim: scienter and loss causation. *See* Br. at 17-23 (scienter), 23-25 (loss causation). Because the Court finds that Plaintiffs fail to sufficiently plead material misrepresentations, it declines to analyze Defendants' additional arguments.

16

### B. Plaintiffs' 10b-5 Claim against Individual Defendants

Plaintiffs fail to state actionable misstatements or omissions. These deficiencies are fatal to Plaintiffs' § 10(b) claims against the Individual Defendants as well. Therefore, Plaintiffs' § 10(b) claims against Lulla, Deshpande, Heffernan, and Parameswaran are dismissed.

### C. Plaintiffs' 20(a) Claim against Individual Defendants

To state a claim for control person liability under § 20(a) of the Exchange Act, a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted). Because the Plaintiffs have failed to state a primary violation under § 10(b), they cannot establish control person liability under § 20(a). *See Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed.").

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. The consolidated class amended complaint is DISMISSED with prejudice. This order moots Defendants' request for oral argument and resolves Docket Number 71.

SO ORDERED.

Dated: September 22, 2017
New York, New York

ALISON J. NATHAN
United States District Judge